UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

David Mitchell

      Plaintiff,

v.                                                                                    Case No. 16-10570

Monroe, County of, *et. al.*                                          Hon. Sean F. Cox

      Defendants.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      In this action, Plaintiff David Alan Mitchell ("Plaintiff") brings § 1983 claims against the
County of Monroe and several of its officers. Plaintiff alleges that Defendants violated his
constitutional right to be free from excessive force. The excessive force claims stem from an
altercation between Plaintiff and the individual Defendants while Plaintiff was in custody at the
Monroe County Jail. During this altercation, Plaintiff was tasered and physically restrained.
Plaintiff allegedly suffered physical and mental injuries as a result. Plaintiff also brings a
municipal liability claim against Monroe County.

      Currently before the Court is Defendants' Motion for Summary Judgment. (Doc. # 37).
Defendants' motion has been fully briefed. The Court finds that oral argument would not
significantly aid in the decisional process and therefore orders that the instant motion will be
decided upon the briefs. See E.D. Mich. LR 7.1(f). For the reasons that follow, the Court shall
**GRANT** Defendants' motion.

1

# BACKGROUND

## I.      Factual Background[1]

### A.      Plaintiff's arrest

On December 19, 2014, Plaintiff was stopped by a police officer for speeding.  (Def.s'
Stmt. ¶ 1).  During this encounter, the officer (who is not a party to this case) discovered that
there was an outstanding warrant for Plaintiff's arrest for failing to pay child support.  (*Id*.).
Plaintiff was subsequently transported to the Monroe County Jail.  (*Id*.).

### B.      Arrival and Booking at Monroe County Jail

Upon arriving to the jail, Plaintiff testified that he was searched, stripped down, given
clothes, and one blanket.  (Ex. A to Pl.'s Resp., Pl.'s Dep. at 46).  Plaintiff was subsequently
placed in a holding cell until he was booked later that morning.  Plaintiff estimates that the cell
was approximately 51 degrees and that he was unable to sleep as a result.  (*Id*.).

In the morning, Plaintiff was taken to the jail's booking room.  The ensuing activity was
largely captured on video recording.  (Ex. 5 & 6 to Def.s' Br.).  Although there is no audio,
Plaintiff can be seen standing at the booking counter speaking to Corrections Officer Sean Almes
("Defendant Almes").  Defendant Almes can be seen standing inside the guard booth.  Defendant
Almes and Plaintiff were separated by a chain link fence.  (Ex. D to Pl.'s Resp. at 53).  Plaintiff
was not handcuffed at this time and had a blanket wrapped over his shoulders.  Plaintiff appears
calm and non-combative.

Defendant Almes was responsible for asking Plaintiff intake questions, which included

---

[1] Pursuant to this Court's Practice Guidelines, Defendants have filed a Statement of
Material Facts Not in Dispute (Doc. # 36, Def.s' Stmt.) and Plaintiff has filed a Counter-
Statement of Disputed Facts (Doc. # 44 at pp. 8-14, Pl.'s Stmt.).

questions as to whether Plaintiff suffered from depression and/or whether Plaintiff was on medication for depression. The parties dispute whether Plaintiff responded to these questions by stating that he was feeling suicidal.

According to Defendant Almes, Plaintiff stated that "he was feeling suicidal" during booking. (Ex. 3 to Def.s' Br. at ¶ 1). However, Plaintiff testified as to the following:

> I admitted to him that, yes, I'm under anti-depressants for suicidal thoughts, and [Almes] jumped right to that, are you suicidal now. I never gave an answer to that question was I suicidal now. I gave a, what would I do if I was, grind my nose back and forth on this chicken wire until I was dead?

(Pl.'s Dep. at 49). According to Plaintiff, Plaintiff then sarcastically pressed his nose up in the chain link fence and "kind of emulated what [he] would do..." if he were feeling suicidal. (*Id*. at 52).

After this exchange, Defendant Almes notified Field Training Officer Ryan Miekos ("Defendant Miekos") that Plaintiff stated he was feeling suicidal. Defendant Miekos, who was also in the guard booth, instructed Defendant Almes to place Plaintiff in a suicide prevention suit. (Ex. 2 to Def.s' Br., Almes Incident Report). According to Defendant Almes, Plaintiff became agitated when he realized that he was going to be placed in a suicide prevention suit. (*Id*.). Despite being asked to give up his blanket and dress into the suit, Plaintiff refused. (Ex. D to Pl.'s Resp. at 22-23).

Defendant Miekos then notified Sergeant Julie Massengill ("Defendant Massengill") of the situation. Defendant Massengill testified that she was informed of "a suicidal subject at the counter that was uncooperative." (Ex. D to Pl.'s Resp. at 22). Defendant Massengill subsequently made her way to the booking room to explain the jail's suicide policy to Plaintiff. (*Id*. at 32). Defendant Massengill testified that she advised Plaintiff that the officers have a duty

to protect anyone who makes a suicidal statement by placing them in a suicide garment. (*Id.*).

She further advised that there were no exceptions to the policy and that when the policy is

enacted, the inmate is to be placed in a special holding cell – to be checked on every 15 minutes.

(*Id.*). Plaintiff denies being advised of the jail's suicide policy.

Plaintiff was asked numerous times to step into the intake shower room so that the male

officers could dress him in the suicide prevention suit. (*Id.* at 34). Massengill stated that she

advised Plaintiff that "if he didn't cooperate with us and go into the suicide garment, that he

would force us to have to do it for him because we weren't going to allow him to remain

unwatched." (*Id.*).

Plaintiff admits that he refused to comply with Defendants' orders. At his deposition, he

explained that: "I told them that I was not suicidal, and they weren't going to humiliate me by ...

stripping me down butt naked and putting the suit on me when they know I was just being a

smart aleck." (Pl.'s Dep. at 54). Plaintiff further claims that he explained to Defendant

Massengill that he was not suicidal, but that she insisted he could not "retract" his statements.

(*Id.* at 103). According to Plaintiff, Defendant Massengill threatened to "shoot [him] in the chest

with this stun gun" if he refused to wear the suit. (*Id.* at 49). Plaintiff told Defendants that he

would sue them if they touched him and forced him to dress into the suit. (Pl.'s Dep. at 104).

Because Plaintiff failed to comply, Defendant Massengill eventually ordered Officer

Jamie Francisco ("Defendant Francisco") to escort Plaintiff to the intake shower room so that he

can be dressed into the suit. (Ex. D to Pl.'s Resp. at 36). At this point in time, Defendants claim

that Plaintiff's refusal to cooperate escalated to active resistance.

### C. Video Footage of Altercation

As previously mentioned, the altercation that forms the basis of this suit was fully captured by two cameras affixed to the ceiling in the booking room. (Ex. 5 & 6 to Def.s' Br.). Defendants have submitted a copy of two video recordings, which provide the Court with different vantage points of the incident. Exhibit 5 contains footage of the guard booth, the booking counter, and the hallway directly in front of the counter. Exhibit 6 contains footage of the hallway abutting the guard booth and booking counter. To the extent possible, the Court will defer to the video footage–as opposed to the parties' versions of the facts–when describing the altercation.

The Court will refer to the video recordings by the second to the time-stamped information that appears on the tapes. The recording begins with video footage of Plaintiff standing at the booking counter. (Ex. 5 to Def.s' Br.). Plaintiff can be seen conversing with Defendant Almes, presumably answering intake questions. At approximately 9:19:49, while Plaintiff is at the booking counter, a jail trustee can be seen placing a suicide prevention suit on the counter to Plaintiff's right. (*Id*. at 9:19:49). Defendant Almes then walks over to the booking counter and retrieves the suit. (*Id*. at 9:20:03). Defendant Almes then stands next to Plaintiff and gestures toward the shower room several times. (*Id*. at 9:20:10). Almes eventually walks over to the shower room door and faces Plaintiff, who is still standing at the booking counter. (*Id*. at 9:20:23). Plaintiff can be seen conversing with Defendants Almes and Miekos, both of whom are standing at the shower room entrance. (*Id*. at 9:20:25-9:20:50).

At 9:20:55, Defendant Francisco enters the picture. He walks over to Plaintiff's side and can be seen gesturing toward the shower room. (*Id*. at 9:21:01). Plaintiff does not move. Defendant Francisco eventually begins to put on rubber gloves. (*Id*. at 9:21:29).

Defendant Francisco then steps toward Plaintiff, reaches for the blanket over Plaintiff's shoulders, and attempts to secure a grip over Plaintiff. (*Id*. at 9:21:55). Plaintiff can be seen resisting Defendant Francisco's hold by pulling away. (*Id*. at 9:21:57). Defendant Francisco testified that it is considered "active aggression" when an inmate pulls away from an officer. (Ex. E to Pl.'s Br. at 37). Defendant Francisco immediately attempts to put Plaintiff in an "escort hold," which has been described as putting one hand over an inmate's shoulder and one hand on an inmate's wrist. (Ex. 5 to Def.s' Br. at 9:21:59). Plaintiff continues to resist Defendant Francisco's hold.

Defendants Almes and Miekos then approach to assist Francisco in securing Plaintiff. (*Id*. at 9:22:00). At this point in time, all three officers are surrounding Plaintiff and there appears to be a struggle as Defendants attempt to pull Plaintiff down toward the hallway abutting the booking counter. (Ex. 6 to Def.s' Br. at 9:09:50).

Defendant Miekos testified that he attempted to secure Plaintiff by using a straight arm-bar takedown. (Ex. C to Pl.'s Resp. at 44). Miekos explained that he stepped in to grab Plaintiff's arm, but Plaintiff turned away. (*Id*.). This caused Miekos to lose his grip over Plaintiff, and when he attempted to "re-grab" Plaintiff's arm, they both went down towards the ground. (*Id*.). Miekos believes that when they initially hit the ground, Plaintiff was on his stomach and that as soon as he hit the ground, he rolled over to his back. (*Id*. at 45).

As Plaintiff is pulled down to the ground, he can be seen thrashing about and kicking his feet in the air. (Ex. 6 to Def.s' Br. at 9:09:55). Defendants Francisco, Miekos, and Almes attempt to secure him, but Plaintiff continues to twist and turn. (*Id*. at 9:09:55-9:10:07). Defendant Almes was attempting to secure Plaintiff's legs and Defendant Miekos attempted to

6

secure Plaintiff's upper body.

Defendant Massengill was following behind as the struggle ensued. While Plaintiff was on the ground, actively resisting, Defendant Massengill applied the taser. (Ex. 6 to Def.s' Br. at 9:10:02). A taser keeps a digital record of the times it is discharged and the data may be downloaded into a log format. Plaintiff claims he was tased three times. However, here, the log indicates that the taser was deployed by trigger one time, with the readout being 9:04:44,[2] for a total of six seconds. (Ex. 12 to Def.s' Br., Taser Report; Ex. 11 to Def.s' Br.). One prong went into the blanket Plaintiff was wrapped in and one prong penetrated Plaintiff's skin in his chest area. (Ex. 7 to Def.s' Br.; Ex. 11 to Def.s' Br.).

Plaintiff stopped resisting after he was tased. Deputy Matthew Frazer ("Defendant Frazer") can be seen approaching the hallway at this time. (Ex. 6 to Def.s' Br. at 9:10:29; Ex. 13 to Def.s' Br.). Plaintiff remained still on the floor, as several officers surrounded him. Nurse Denise Saks enters the picture several minutes later and appears to examine Plaintiff while he lay on the ground.

Plaintiff was then lifted to his feet. (*Id*. at 9:12:27-9:13:41). Nurse Saks can be seen removing one prong from Plaintiff's chest area (*Id*. at 9:13:47) and checking the rest of Plaintiff's body for prongs. (*Id*. at 9:14:10). Saks provides the prong she retrieved from Plaintiff's chest to an officer and proceeds to check Plaintiff's mouth and chest. The video footage ends as the officers walk Plaintiff to the shower room. (*Id*. at 9:15:00).

---

[2] The Court notes that there is a discrepancy between the second to time-stamped information on the recordings and the read-out time listed on the log. Neither party has made any mention of this and it does not appear to be outcome-determinative. Notably, Plaintiff has not disputed the validity of the information contained in the log.

There is no dispute that Plaintiff was subsequently dressed in the suicide prevention suit and placed in a cell. (Def.s' Stmt. at ¶ 30; Pl.'s Stmt. at ¶ 30). Nor do the parties dispute that within approximately 20 minutes, an Oakland County sheriff's deputy appeared at the jail in response to the Oakland County warrant.

### D. Plaintiff's Testimony Re: Altercation

Although the video footage clearly depicts the altercation, the Court will briefly recite Plaintiff's version of events to highlight any disputes. Plaintiff denies that he was resisting and describes the incident as follows:

> There wasn't much talking going on. There was - they brought me out and up to the desk to book me, and as she was trying to convince me by telling me either I'm going to strip and put this suit on or she's going to shoot me in the chest, when I said no, they surprised me by jumping over my back and grabbing me and exposing my chest, and I was hit with ... the first blast of the stun gun.
>
> . . . .
>
> There was a second group of ... guards, at least two more ... that showed up right away to try to ... get me down, I guess you could say it. They were pulling me left to right . . . . And then – and a large security – or a large jail guard picked me up and slammed me to the concrete. And when he did, my head busted open, and he hollered that we got a bleeder. And then he put his knee cap into my ear socket, and he ground my head into the concrete until my jaw dislocated. And then they grabbed my arms and legs and they pulled them out and they stretched them and they stood on them. And then – then he hollered back at the lady to hit me again with the stun gun, and she hit me a third time. Then when I was – wasn't quite done shaking they did a wrestling chicken move on me and forced their arm up and behind my shoulder and stretched my shoulder behind my back and that's what screwed up my shoulder and flipped me over and – and I was bleeding from the chest . . . .

(Pl.'s Dep. at 57, 60-61). After Plaintiff was dressed in the suicide prevention suit, he remembers an Oakland County deputy appearing at his jail cell. Plaintiff testified that:

> Yes, and an Oakland County officer walks up to the – to the jail door and he said, Mr. Mitchell, I just saw what they did to you, and I'm going to get you out of here

now. They're over laughing and joking about what they did to you and they're watching it on tape and Oakland County wants no part of this, and I'm taking you to the closest hospital. The warrant against you has been cancelled, and we're going to let you go.

(*Id*. at 70).

### E. Plaintiff's Testimony Re: Injuries Sustained After Altercation

Plaintiff testified that after the altercation, he was bleeding at the corner of his eye socket. (Pl.'s Dep. at 68). He explained that the spot of blood was roughly the size of a nickel. (*Id*.). Plaintiff also stated that he was bleeding from the inside of his mouth. (*Id*.). Defendants Miekos and Massengill similarly testified that they recalled seeing "a little bit of blood" on Plaintiff's face. Plaintiff also claims that his jaw was dislocated as a result of the pressure from one of the defendants' kneecaps pressing into his ear socket. (*Id*. at 62).

Plaintiff admits that he never asked for medical attention after Nurse Saks examined him. (*Id*. at 109). Plaintiff explained, however, that he did not have time to ask for medical care and that he was never offered such care. (*Id*.).

### F. Medical Records

After the incident at the jail, the Oakland County deputy dropped Plaintiff off at Monroe Mercy Hospital. (Def.s' Stmt. at ¶ 31; Pl.'s Stmt. at ¶ 31). Plaintiff testified that he decided to go to St. Joseph Mercy Hospital because he did not trust Monroe Mercy. (*Id*.).

Plaintiff's medical records confirm that Plaintiff suffered: abrasions to the right side of his face and to both ears; mild bruising on the left occipital regions of his head with tenderness to palpation; and tenderness to palpation in right costal margin of his chest wall. (Ex. G to Pl.'s Resp.).

### II. Procedural Background

Plaintiff filed the instant action on February 16, 2016. (Doc. # 1). Plaintiff's First Amended Complaint, which is the operative complaint in this suit, names the following as defendants in this action: (1) County of Monroe; (2) Ryan Miekos; (3) Julie Massengill; (4) Sean Almes; (5) Jammie Francisco; (6) Matthew Frazer; and (7) Denise Saks. Since the filing of his amended complaint, Denise Saks has been voluntarily dismissed from this case. (Doc. # 42).

Plaintiff's complaint alleges the following four counts:

| Count I | Violation of the Fourth Amendment, 42 U.S.C. § 1983 Excessive Force |
|---|---|
| Count II | Violation of the Due Process Clause of the Fourteenth Amendment, 42 U.S.C. § 1983—Excessive Force |
| Count III | Violation of the Fourteenth and Eight Amendments—42 U.S.C. § 1983 Deliberate Indifference to Medical Needs |
| Count IV | County of Monroe's Constitutional Violations |

(Pl.'s Compl.). Plaintiff seeks monetary relief for the damages allegedly sustained as a result of these violations.

Following the close of discovery, Defendants filed the instant Motion for Summary Judgment. (Doc. # 37, Def.s' Br.). In it, Defendants argue that their actions in restraining a resisting inmate do not constitute violations of Plaintiff's constitutional rights and that each of the individual defendants are entitled to qualified immunity. Defendants also argue that Plaintiff's deliberate indifference claim fails because Plaintiff was not denied medical attention and he did not suffer from a sufficiently serious medical need. And finally, Defendants argue that Plaintiff's municipal liability claim against the county fails because Plaintiff did not suffer a constitutional violation or, alternatively, because Plaintiff cannot establish that any alleged violation was the result of a lack of training or supervision. Plaintiff has filed a response in

opposition (Doc. # 44, Pl.'s Resp.), and Defendants have filed a reply.  (Doc. # 48, Def.s'
Reply).

## STANDARD

Summary judgment will be granted where there exists no genuine issue of material fact.
*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  No genuine issue of material fact
exists where "the record taken as a whole could not lead a rational trier of fact to find for the
non-moving party."  *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587
(1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will
be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."
*Anderson*, 477 U.S. at 252.

The Court "must view the evidence, all facts, and any inferences that may be drawn from
the facts in the light most favorable to the non-moving party."  *Skousen v. Brighton High School*,
305 F.3d 520, 526 (6th Cir. 2002).  "The court's duty to view the facts in the light most
favorable to the nonmovant does not require or permit the court to accept mere allegations that
are not supported by the factual evidence."  *Chappell v. City of Cleveland*, 585 F.3d 901, 906
(6th Cir. 2009).  "This is so because the nonmovant, in response to a properly made and
supported motion for summary judgment, cannot rely merely on allegations but must set out
specific facts showing a genuine issue for trial."  *Id.*

Moreover, the Court "is not obligated to, and should not, rely on the nonmovant's version
where it is 'so utterly discredited by the record'" as to be rendered "visible fiction."  *Id.* (quoting
*Scott v. Harris*, 550 U.S. 372, 378-80 (2007)).  "In *Scott*, the Eleventh Circuit was held to have
erred by accepting the plaintiff's version of the facts as true even though that version was so

conclusively contradicted by the record that no reasonable jury could believe it." *Id.*

# ANALYSIS

## I.    Qualified Immunity

In Counts I, II, and III of his amended complaint, Plaintiff alleges that Defendants Almes, Miekos, Francisco, Massengill, and Frazer violated his constitutional rights. Defendants argue that they are entitled to qualified immunity on Plaintiff's Fourth and Fourteenth Amendment claims.

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law. *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009). Here, there appears to be no dispute that Defendants were acting under the color of state law. As such, the Court will focus on the first element of Plaintiff's claim: whether the facts establish a deprivation of a constitutional right.

Under the doctrine of qualified immunity, government officials performing discretionary functions are generally shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.*; *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008).

Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was

clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549.

Because Plaintiff's Counts are asserted against more than one defendant, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

### A.      Constitutional Violation - Excessive Force

In Counts I and II, Plaintiff alleges that Defendants Almes, Miekos, Francisco, Massengill, and Frazer violated his constitutional right to be free from excessive force, in violation of the Fourth and Fourteenth Amendments. Plaintiff's excessive force claims–whether brought under the Fourteenth Amendment or the Fourth Amendment–are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015); *see also Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (holding that in the wake of the Supreme Court's decision in *Kingsley*, "a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment").

"Under the Fourth Amendment, [courts] apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (internal citations omitted).

In order to determine whether the force used here was constitutionally excessive, the Court must examine the following three factors: (1) the severity of Plaintiff's crime; (2) the threat posed by Plaintiff; and (3) whether Plaintiff was attempting to resist or evade arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989). This inquiry must be "assessed from the

perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Burgess*, 735 F.3d at 473 (internal citations omitted).

In making this determination, the Court must "balance the consequences to the individual against the government's interests in effecting the seizure." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). The Court must also consider the legitimate interests in managing a jail, "acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Kingsley*, 135 S.Ct. at 2474.

### 1. Plaintiff Cannot Establish That Defendants' Use of Force Was Constitutionally Excessive In Light of Plaintiff's Active Resistance

Even after viewing the facts in a light most favorable to Plaintiff, Plaintiff cannot establish that the amount of force used against him was constitutionally excessive. The video footage, along with the deposition testimony, renders Plaintiff's version of the story–which attempts to portray Plaintiff as a cooperative pretrial detainee–a "visible fiction." *Scott*, 550 U.S. at 381.

Here, Plaintiff argues that his refusal to put on a suicide prevention suit did not warrant the force used against him. (Pl.'s Resp. at 23). Plaintiff's focus is almost entirely on whether he was feeling suicidal during booking. The problem with Plaintiff's argument is that it confuses the Court's inquiry. The issue here is not whether Plaintiff was feeling suicidal. Notably, Plaintiff does not attempt to argue that ordering a non-suicidal inmate to wear a suicide prevention suit amounts to excessive force. Rather, the issue here is whether the amount of force used by Defendants in subduing Plaintiff, *after Plaintiff began to resist their orders*, amounts to

14

excessive force.

Here, the video footage clearly shows: (1) Plaintiff resisting Defendants' efforts to lead him to the shower room; and (2) Plaintiff's efforts to break away from Defendants.

Plaintiff's active resistance is fatal to his excessive force claims. The Sixth Circuit has explained that "[w]hen a suspect actively resists arrest, the police can use [force such as] a taser (or knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). "Active resistance includes physically struggling with, threatening, or disobeying officers." *Id.* (internal quotation marks and citation omitted). Active resistance also "includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Id.* (internal citation omitted).

**Defendant Francisco**

As to Defendant Francisco, Plaintiff argues that the "video shows him forcefully grabbing Plaintiff and choking him by wrapping his large arm around Plaintiff's neck." (Pl.'s Resp. at 27). Plaintiff concludes that this force was excessive because Plaintiff was not "rabidly out of control," and because Plaintiff was not "acting in a threatening, much less suicidal manner." (*Id.*). Plaintiff's argument is without merit.

Defendant Francisco did not use excessive force in initially placing his hands over the blanket on Plaintiff's shoulders in order to lead Plaintiff to the shower room. This was objectively reasonable force in light of Plaintiff's admitted refusal to dress into the suit. Nor did Defendant Francisco use excessive force when he attempted to place Plaintiff in an "escort hold" by wrapping his arms around Plaintiff's shoulder and chest area. Defendant Francisco only

resorted to this after Plaintiff began to resist by pulling away from Defendant's initial grasp. Plaintiff conveniently fails to mention this fact.

Moreover, Plaintiff has not cited a single case that would support finding excessive force, where, as here, an officer struggles to secure an actively resisting inmate. Plaintiff's reliance on *Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007) is misplaced. In *Griffith*, the Sixth Circuit held that it would be excessive force for an officer to "almost immediately and without provocation" begin choking a suspect. *Griffith*, 473 F.3d at 658. Here, Plaintiff's version of events–that Francisco forcefully grabbed and choked Plaintiff without provocation–cannot be believed in light of the video recording. And, unlike the plaintiff in *Griffith*, it is undisputed that Plaintiff here was resisting Defendant Francisco's hold. Because Plaintiff was actively resisting, the second and third *Graham* factors–whether Plaintiff posed a threat and whether Plaintiff was actively resisting–weigh in Defendant Francisco's favor. After viewing all of the facts in Plaintiff's favor, the Court still concludes that Defendant Francisco's actions were not unreasonably excessive.

**Defendant Miekos**

As to Defendant Miekos, Plaintiff argues that he "slammed Plaintiff to the ground by using a straight arm bar takedown maneuver and then got on top of Plaintiff's body."[3] (Pl.'s Resp. at 27). Plaintiff claims that this was excessive and unreasonable. Again, Plaintiff's argument suffers from the same flaw as above: it disregards the video footage of the incident and the undisputed fact that Plaintiff was actively resisting Defendants' orders.

---

[3] To the extent that Plaintiff argues that "one of the Defendants jammed their knee into Plaintiff's right ear during the encounter," Plaintiff has not pointed to any evidence that would attribute this to Defendant Miekos.

Under many circumstances, takedowns are appropriate. *See Hayden v. Green*, 640 F.3d 150, 154 (6th Cir. 2011). "The key point in the analysis is whether there was some real form of resistance or danger." *Jennings v. Fuller*, 659 Fed. App'x 867, 870 (6th Cir. 2016) (citing *Hayden*, 640 F.3d at 154). Here, at the time that Defendant Miekos stepped in to assist Defendant Francisco, Plaintiff was clearly resisting efforts to secure him. Defendant Miekos attempted to assist by using a straight arm bar take down so that the officers can secure and handcuff Plaintiff. Because Plaintiff was resisting, Defendant Miekos lost control and they both fell down to the ground. Once he hit the ground, Plaintiff flipped over on to his back and began kicking at the officers.

Viewing the facts in a light most favorable to Plaintiff, the Court cannot conclude that Defendant Miekos used constitutionally excessive force in attempting to secure Plaintiff. It is undisputed that Plaintiff was resisting by pulling away from the officers, kicking at the officers and thrashing about. Plaintiff was actively resisting and posed a threat to the officers as a result. *See Graham*, 490 U.S. at 396 (discussing factors to assess in objective reasonableness inquiry).

**Defendant Almes**

As to Defendant Almes, Plaintiff argues that Defendant Almes was an "active participant in the unreasonable force used against Plaintiff." (Pl.'s Resp. at 27). Plaintiff takes issue with Defendant Almes "holding Plaintiff's right leg" down during the altercation because Plaintiff did not swing his arms and attempt to hit anyone. Plaintiff's argument is without merit.

Again, the video footage is clear that at the time that Defendant Almes attempted to assist Defendant Francisco, Plaintiff was actively resisting, thrashing about, and kicking his feet in the air. Moreover, Plaintiff fails to cite a single case that would support a finding of excessive force

where, as here, an officer attempts to subdue a resisting inmate by securing the inmate's legs. After viewing the facts in a light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to establish excessive force as to Defendant Almes.

**Defendant Massengill**

As to Defendant Massengill, Plaintiff summarily argues that the use of a taser in this case was excessive and unreasonable in light of the circumstances. (Pl.'s Resp. at 28). Plaintiff cites *Baker v. Union Township*, 587 Fed. App'x 229 (6th Cir. 2014) for the proposition that Defendant Massengill's failure to "immediately warn Plaintiff that he would be tased" supports a finding of excessive force. (*Id.*). Plaintiff's argument is without merit.

First, Plaintiff's reliance on *Baker* is misplaced. In *Baker*, the Sixth Circuit held that it was objectively unreasonable for an officer to tase a suspect who offered no resistance or indication of aggression. *Baker*, 587 Fed. App'x at 234. There, the officer "gave no warning or commands–he simply shot [the plaintiff] with his taser, incapacitating [the plaintiff] and causing him to fall down the staircase..." *Id.* The Sixth Circuit explained that none of the *Graham* factors weighed in the officer's favor because: (1) the crime at issue was not severe; (2) the suspect was not behaving aggressively at the time of the tasing; and (3) the suspect was not resisting arrest or attempting to flee at the time of the tasing. *Id.*

The facts here are clearly distinguishable. Notably, according to Plaintiff's own testimony, Defendant Massengill did in fact warn Plaintiff that she would tase him in the chest if he did not comply with the order to wear the suicide prevention suit. The fact that she did not "immediately" warn Plaintiff does not render her actions constitutionally excessive. Moreover, unlike the plaintiff in *Baker*, Plaintiff here was actively resisting at the time that the taser was

18

applied. Based on these undisputed facts, the second and third *Graham* factors weigh in Defendant Massengill's favor.

Accordingly, even after viewing all of the facts in Plaintiff's favor, Defendant Massengill's use of a taser does not constitute excessive force. *See e.g., Rudlaff*, 791 F.3d at 641 ("Our cases firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest") (internal citations omitted); *see also Williams v. Sandel*, 433 Fed. App'x 353, 363 (6th Cir. 2011) (not excessive force to tase the suspect thirty-seven times (and use batons and pepper spray) because he actively resisted arrest).

**Defendant Frazer**

Plaintiff's attempt to hold Defendant Frazer liable for excessive force is puzzling, given the following undisputed facts: (1) Defendant Frazer was not involved in the decision to restrain Plaintiff; (2) Defendant Frazer was not involved in the takedown of Plaintiff; and (3) Defendant Frazer was not present during the altercation. (Ex. F to Pl.'s Resp. at 15-18). The only contact Defendant Frazer made with Plaintiff occurred *after* Plaintiff was tased, secured, and handcuffed. (*Id*. at 17-18). The video recording shows Defendant Frazer helping Plaintiff to his feet and checking Plaintiff for prongs. As such, the Court finds no basis under which Plaintiff may hold Defendant Frazer liable for excessive force.

And to the extent that Plaintiff argues that Defendant Frazer "had the ability to intervene on Plaintiff's behalf but failed to do so," Plaintiff's claim is without merit. It is undisputed that Defendant Frazer was not present during the takedown and subsequent tasing of Plaintiff. As such, it would have been impossible for Defendant Frazer to intervene. Despite reviewing the facts in Plaintiff's favor, the Court cannot conclude that Defendant Frazer acted with excessive

force.

**B.     Constitutional Violation – Deliberate Indifference**

In Count III, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth and Fourteenth Amendments.  The Due Process Clause of the Fourteenth Amendment affords pretrial detainees "a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment."  *Gray v. City of Detroit*, 399 F.3d 612, 615-16 (6th Cir. 2005).  The deliberate indifference standard consists of both an objective and subjective component. The objective component is satisfied by showing that an inmate has a medical need that is "sufficiently serious."  *Farmer v. Brennan,* 511 U.S. 25, 834 (1994) (internal quotation marks and citations omitted).  To qualify as "sufficiently serious," the need must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a layperson would recognize the necessity for a doctor's attention.  *Blackmore v. Kalamazoo Cnty*., 390 F.3d 890, 899 (6th Cir. 2004).  The subjective component is satisfied by showing that Defendants possessed "a sufficiently culpable state of mind in denying medical care."  *Miller v. Calhoun County*, 408 F.3d 803, __ (6th Cir. 2005).

**1.     Plaintiff Cannot Establish Deliberate Indifference On The Part Of Defendants**

Here, Plaintiff takes issue with Defendants' decision to seek medical treatment from Nurse Saks.  Plaintiff's argument–which is roughly two sentences long–is as follows:

> Given the physical injuries that could have been seen by Defendants, they should have made arrangements for Plaintiff to be seen by medical providers outside of the jail.  Bleeding anywhere in the head can be an indication of a serious medical problem, and one that would arguable [sic] be outside the scope of a jail nurse.

(Pl.'s Resp. at 30).  Even assuming Plaintiff can establish the objective component of the

deliberate indifference standard, he cannot establish the subjective component.

Simply put, Plaintiff has not established that Defendants were deliberately indifferent to any claimed need. In fact, it is undisputed that Defendants sought medical care for Plaintiff within minutes after he was tased and secured. It is also undisputed that Nurse Saks examined Plaintiff. Plaintiff at no point in time stated that he required medical care in addition to Nurse Saks' examination. Nor did he complain of pain after Nurse Saks' examination was complete. To the extent that Plaintiff now argues that Defendants "should have made arrangements for Plaintiff to be seen by medical providers outside the jail," this is insufficient to establish that Defendants acted with the requisite culpability. There is absolutely no evidence establishing that any of the individual defendants were on notice that Plaintiff required additional medical care after he was cleared by Nurse Saks.

## II.     Municipal Liability

Count IV of Plaintiff's amended complaint seeks to hold the County of Monroe liable for the alleged constitutional violations. Plaintiff's claim for municipal liability fails for two reasons.

First, because the individual defendants did not violate Plaintiff's constitutional rights, Plaintiff cannot establish a claim of municipal liability against Monroe County. *See Cleary v. County of Macomb*, 409 F. App'x 890, 906 (6th Cir. 2011) (noting that under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may only be liable to a plaintiff under § 1983 if the plaintiff demonstrates that a constitutional violation occurred and that it was the result of a policy or custom of the municipality).

Second, even if Plaintiff established constitutional violations, his municipal liability

claim would still fail.  A municipality "be held liable under § 1983 if it maintained a policy or custom that caused the violation" of the plaintiff's rights.  *Harvey v. Campbell County*, 453 Fed. App'x 557, 562 (6th Cir. 2011).  Here, Plaintiff does not base his claim against Monroe County on any actual custom or policy.  Instead, Plaintiff's § 1983 claim is a claim predicated upon a "failure to train" theory of municipal liability.  Plaintiff essentially argues that Monroe County's failure to conduct performance evaluations permits officers to continuously violate constitutional rights.  (Pl.'s Resp. at 31-32).

In limited circumstances, a local government's failure to train police officers may be deemed a "policy or custom" for purposes of municipal liability.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  In order for Plaintiff to establish deliberate indifference, he "must show prior instances of unconstitutional conduct demonstrating that the [County of Monroe] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."  *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).

Here, Plaintiff has failed to point to any official or unwritten policy or any specific defect in training.  Plaintiff has also failed to offer any evidence of prior instances of unconstitutional conduct, which would demonstrate that the County of Monroe was on notice of any deficient training.  Nor has Plaintiff even suggested, for example, that the number of excessive force incidents in Monroe County is greater than is to be expected from a properly-trained agency.  As such, this claim fails.

**CONCLUSION & ORDER**

For the foregoing reasons, the Court shall **GRANT** Defendants' Motion for Summary

Judgment.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  June 2, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 2, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager